**Jack FRIEDMAN, et al., Plaintiffs,**

**v.**

**Cesar PERALES, et al., Defendants.**

**No. 82 Civ. 5403.**

United States District Court,
S.D. New York.

Aug. 27, 1985.

---

Marvin Neiman, New York City, for plaintiffs.

Marion R. Buchbinder, Asst. Atty. Gen., New York City, for defendants.

## MEMORANDUM DECISION

GAGLIARDI, Senior District Judge.

Plaintiffs, doing business as Franklin Nursing Home ("Franklin"), have brought these two consolidated actions alleging that defendants, state officials administering the New York Medicaid program, violated federal and state law in setting the 1979, 1980 and 1981 reimbursement rates of Franklin.[1] Plaintiffs seek an order directing defendants to reimburse Franklin for the 1979–1981 period according to a corrected rate of reimbursement. Plaintiffs also request declaratory and injunctive relief against the continued use of rate ceilings with regard to certain items of reimbursement. Each side has moved for summary judgment pursuant to Rule 56, Fed.R. Civ.P.

### Background

Pursuant to a stipulation of facts entered into by the parties, the following facts are undisputed except where otherwise noted. Plaintiffs are the licensed operators of Franklin, a 320 bed proprietary residential health care facility (RHCF) in Flushing, New York, that began operations in April, 1974. At all relevant times, Franklin has participated in the Medicaid program as a provider reimbursed by federal and state funds for the costs of services to eligible patients pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. ("Title XIX").

1. The defendants are Cesar Perales, Commissioner of the New York State Department of Social Services, and David Axelrod, Commissioner of the New York State Department of Health.

Pursuant to 42 U.S.C. § 1396a, a state must administer the Medicaid program according to a state plan that meets certain federal requirements. Under section 1396a(a)(13), the state plan must provide for the reasonable payment of qualifying RHCF services.[2] The New York Department of Social Services has filed a set of regulations, 10 N.Y.C.R.R. § 86–2, with the Secretary of Health and Human Services as the state plan for the reimbursement of RHCFs. Franklin has received reimbursement for services rendered to eligible patients pursuant to its provider agreement and the approved rates of reimbursement under the state plan.

Under New York's system of prospective reimbursement, the rates for a current year ("rate year") are based on the costs incurred by the RHCF during a previous year ("base year"). Such base year costs must be reported to the state by the RHCF in accordance with generally accepted accounting principles ("GAAP"). *See* section 86–2.4. The base year operating costs that are allowed by the state are "trended forward" to account for inflation between the base year and rate year. Base year fixed costs are not trended forward.

Since rate year reimbursement is tied to costs incurred in the base year, the RHCF will not normally be reimbursed for the costs of new services that commence during the rate year. However, the RHCF may apply for a rate revision if the new costs represent a significant increase in total expenditures.

In their complaints, filed in August 1982 and March 1983, plaintiffs challenge defendants' reimbursement decisions regarding (1) "start-up" costs, (2) accounting and reporting costs, (3) salary ceilings, (4) real property costs ceilings, and (5) moveable equipment costs ceilings.

### 1. *Start-up Costs*

From the date of its opening in April 1974, Franklin had a certified bed capacity of 320. The Department of Health ("DOH"), however, limited the number of new patients that Franklin could admit to its facility each day.[3] It was not until the end of 1974 that Franklin reached 99% occupancy; Franklin's average occupancy rate for its first rate year was about 68%.

In its 1976 cost report, Franklin reported a $191,598 loss in 1974 from underutilization. Franklin subsequently sought reimbursement for amortization of the $191,598 expense over a 60-month period beginning in April, 1974. The DOH denied any reimbursement.[4] Plaintiffs claim, *inter alia*,

---

**2.** During the period from July 1, 1976 to September 30, 1980, section 1396a(a)(13)(E) required that such payment be determined "on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary." Since October 1, 1980, the effective date of an amendment to the Social Security Act, federal law has required such payment to be provided "through the use of rates (determined in accordance with methods and standards developed by the State) ... which the State finds, and makes assurance satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...." 42 U.S.C. § 1396a(a)(13)(A).

From 1969 through December 31, 1982, New York's Public Health Law ("P.H.L.") § 2807(3) required that Medicaid reimbursement of RHCFs be "reasonably related to the costs of efficient production of service[s]." Since January 1, 1983, that section has tracked the language of the federal requirement of "reasonable and adequate" reimbursement.

**3.** According to the DOH, limiting admissions to four to five patients per day to a new RHCF is necessary to ensure adequate patient care.

**4.** The basis of the decision was 10 N.Y.C.R.R. § 86–2.17(a), which incorporates federal Medicare principles of reimbursement into the Medicaid plan insofar as the Medicare principles are not inconsistent with express provisions of the state plan. According to defendants, the Medicare principle governing the issue of start-up costs is found in the Health Insurance Manual ("HIM–15") § 2132.2, which defines start-up costs as those incurred before the admission of the first patient. Plaintiffs contend that the applicable Medicare principle is HIM–15 § 2132.3(A)(2), which provides that "[w]here a provider prepares portions of its facility for patient care services on a piecemeal basis, start-up costs must be capitalized and amortized separately for the portions of the provider's facility that are prepared for patient care services during different periods of time."

that such denial violated Franklin's right to equal protection, since voluntary not-for-profit RHCFs under Public Health Law Article 28–A receive start-up cost reimbursement.[5]

### 2. Accounting and Reportings Costs

In 1978 the DOH notified RHCFs of extensive new accounting and reporting requirements and directed that the facilities substantially comply with the new requirements in 1980 and fully comply in 1981. In 1979 Franklin acquired a computer, under a lease-purchase agreement, for the purpose of complying with the new requirements. Franklin did not receive reimbursement in 1979 for the computer costs incurred in that year; rather, such costs were reimbursed according to the standard base year-rate year methodology. Franklin's 1981, 1982, and 1983 reimbursement rates included amounts equal to computer costs for the 1979, 1980, and 1981 base years, respectively.

By administrative appeals in 1980 and 1981, Franklin sought reimbursement of its computer costs on a current basis on the ground that the new costs represented a significant increase in Franklin's total expenditures. The DOH denied the appeal, citing an industry-wide survey indicating that the new reporting requirements caused only an insignificant increase in costs. Franklin now claims that defendants' denial of current-year reimbursement for its computer costs violated its right under state law (10 N.Y.C.R.R. § 86–2.14) to reimbursement for the costs of mandated services.

### 3. Salary Ceilings

The DOH imposes ceilings on the base year costs for salaries paid to administra-tors, medical directors, and relatives of owners. Base year costs are allowable up to the ceilings and are trended forward to account for inflation between the base year and the rate year. Franklin's reported costs for base years 1976 and 1978 were below the ceiling and fully allowable. However, because the 1980 trend factor was lower than the 1979 trend factor —while the base year ceilings remained constant—the maximum reimbursement possible for salaries in 1980 was lower than in 1979. Franklin appealed its 1980 rate and argued that lowering the trend factor without raising the ceiling violated state law. The administrative appeal was denied on the ground that none of Franklin's base year costs for salaries had been disallowed. Franklin in this action claims that the use of the ceiling, "which ... remained constant," violated its rights under federal law and the state plan. Subsequent to Franklin's administrative appeals, the base year ceilings were increased for the 1982 rate year and again increased for the 1983 rate year.

Costs for physicians' services are also subject to ceilings. For the 1974 through 1981 rate years, the base year ceiling for physicians' fees was $180 per bed. The ceilings have subsequently been raised.[6] Reported costs up to the ceiling are allowed and trended forward to account for inflation between the base year and rate year. Where, however, physicians' services are added during the rate year, reimbursement will be paid during the rate year, but only at the base year ceiling itself, with no trend factor applied.

Because, prior to February 1979, Franklin's physicians billed Medicaid directly, the costs of physicians' services were not included in Franklin's rates. Subsequently, Franklin added physicians' services as a

---

**5.** Article 28–A facilities receive mortgage assistance from the state covering up to 97% of the facility's "project cost." The "project cost" includes the facility's "initial occupancy expense" ("I.O.E."), which is the revenue loss incurred by the new facility prior to reaching normal occupancy. Pursuant to 10 N.Y.C.R.R. § 86–2.19(d), Medicaid rates for Article 28–A facilities include payment sufficient to reimburse those facilities

for the debt service on their mortgage loans, including the "I.O.E." component of those loans. Franklin is not an Article 28–A facility.

**6.** In the 1982 rate year, the base year (1980) ceiling for physicians' services was $244 per bed; in the 1983 rate year, the base year (1981) ceiling was $270 per bed.

new service and was reimbursed at the base-year ceiling rate; certain reported costs above the ceiling were disallowed. Plaintiffs contend here, as they charged in their administrative appeal on this issue, that the use of the ceiling, without any trend factor, meant that the facility was not reimbursed for costs reasonably incurred in 1979 and 1980. The defendants allege that, when Franklin's Medicare reimbursement for physicians' services is considered, Franklin was actually over-compensated for physicians' services.

### 4. *Real Property Costs Ceiling*

Because Franklin is a proprietary RHCF which opened prior to March 10, 1975, and has a lease determined by the DOH to be arms-length, its reimbursement rate for real property costs is subject to ceilings. Such ceilings—"historical limitations set forth by the commissioner" under 10 N.Y. C.R.R. § 86–2.21(c)(2)—have not been adopted in any regulation or otherwise implemented in accordance with the New York State Administrative Procedure Act ("SAPA"). Article 28–A facilities are not subject to the ceilings, but are reimbursed according to a different methodology.

Franklin pursued an unsuccessful administrative appeal of its 1981 rates challenging the defendants' disallowance of those reported rental costs that exceeded the ceiling and the inclusion within the ceiling of amounts for leasehold improvements and insurance. Franklin in this action alleges that the ceilings were adopted in violation of SAPA; that the ceilings violate federal Medicaid law and the state plan; and that the defendant's differing treatment of proprietary facilities and Article 28–A facilities violates the equal protection clause. Plaintiffs also allege that defendants incorrectly applied state regulations when they recomputed the real property component of the 1981 rate instead of continuing the component that existed in 1980 and applying a trend factor.

### 5. *Moveable equipment costs ceilings*

Between the 1974 and 1981 rate years, the DOH imposed ceilings on the total base year costs of moveable equipment. The ceiling on purchased equipment was $300 per bed and covered interest, depreciation, and return on equity. The ceiling on rented equipment was $250 per bed, which covered rent. Starting with the 1982 rate year, the DOH has not imposed ceilings on total base year moveable equipment costs, except for certain limitations on the minimum useful life for depreciation.

In setting Franklin's 1981 rate, the DOH disallowed Franklin's reported 1979 base year costs that exceeded the ceiling. Plaintiffs' administrative appeal was denied. Plaintiffs now challenge the moveable equipment ceilings, asserting the same grounds as advanced with respect to the real property ceilings: that the ceilings were adopted in violation of SAPA; that the ceilings violate federal Medicaid law and the state plan; and that the differing treatment of proprietary facilities (subject to the ceilings) and Article 28–A facilities (not subject to the ceilings) violates the equal protection clause.

### Discussion

■ To the extent that this action arises under federal law, this court has subject matter jurisdiction under 28 U.S.C. § 1331. With respect to claims under state law, plaintiffs urge this court to exercise pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The exercise of pendent jurisdiction is a matter of judicial discretion, not of plaintiffs' right; and in considering the exercise of such discretion, a federal court must be careful to avoid "[n]eedless decisions of state law." *Id.* at 721, 86 S.Ct. at 1136.

Defendants not only oppose the exercise of pendent jurisdiction but argue that this court should abstain entirely from considering plaintiffs' claims. According to defendants, federal courts should defer to the state's administration of the Medicaid program according to the principles enunciated in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In *Bur-*

*ford,* the Supreme Court found abstention appropriate where review by federal courts would disrupt a complex regulatory scheme providing review by specialized agencies and state courts. However, *Burford* is clearly distinguishable. As this court noted in *Aishel Avraham Residential Health Facility v. Perales,* 84 Civ. 3884 (S.D.N.Y. July 5, 1984): "The situation underlying *Burford*—an industry regulated by a state without federal supervision—is absent here. New York does not provide a specialized state court for the consideration of Medicaid cases. Moreover, Medicaid is a joint federal-state program; the state plan is controlled to a large degree by federal laws and regulations."

While *Burford* does not compel abstention on these facts, considerations of comity suggest that a federal court should be reluctant to interfere with the state Medicaid system with respect to those issues that are not of federal interest or significance. Moreover, the basic rationale for pendent jurisdiction—judicial economy—is significantly undercut here by the limitations on the court's power to grant relief against the state defendants. The Eleventh Amendment bars a federal court from granting monetary or injunctive relief against a state strictly on the basis of state law.[7] *Pennhurst State School & Hospital v. Haldeman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Accordingly, to the extent (if any) that plaintiffs present state law claims for relief are not barred by *Pennhurst* or the Eleventh Amendment, the court declines to exercise pendent jurisdiction.

The state argues that all federal claims should be dismissed by reason of its Eleventh Amendment immunity. In opposing such a dismissal, plaintiffs do not dispute that the Eleventh Amendment bars an award for damages which must be paid from the state treasury. *See Edelman v.*

*Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Plaintiffs instead seek to exploit *Edelman*'s distinction between retroactive monetary damages and prospective injunctive relief; the latter form of relief does not violate the Eleventh Amendment. *See Hempstead General Hospital v. Whalen,* 474 F.Supp. 398 (E.D.N.Y.1979), *aff'd,* 622 F.2d 573 (2d Cir.1980).

Plaintiffs' attempt to cast its requested relief in language that will survive Eleventh Amendment scrutiny is only partially successful. To the extent that this action challenges state practices and rate methodologies that remain in effect, the action states a cause of action for prospective relief that does not run afoul of *Edelman.* *See Hempstead General Hospital,* 474 F.Supp. at 406 ("[E]leventh [A]mendment does not bar a federal court from prospectively directing state officials to bring their conduct into conformity with federal law"). However, to the extent that this action seeks reimbursement for past years, the Eleventh Amendment precludes relief.

Franklin argues that it seeks only an order compelling defendants to promulgate "corrected rates" for past years and not an order directing the state to reimburse Franklin for those costs disallowed in past years. According to plaintiffs, the promulgation of corrected rates will not itself effect a transfer of money from the state treasury; rather, any new rates will merely require payment to plaintiffs from the county social services district, which does not share the state's immunity from damages. *See Holley v. Lavine,* 605 F.2d 638 (2d Cir.1979), *cert. denied,* 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980). Plaintiffs acknowledge the fact that the state will in large measure reimburse the county social services district for such payment, *see* N.Y. Social Services Law § 368–a, but contend that this impact on the state treasury "does not implicate the [Eleventh] Amendment."

7. Plaintiffs have argued that those claims alleging violations of state regulations and procedures are also federal claims, under the theory that such regulations and procedures concerning Medicaid become federal law when the Sec-

retary of Health and Human Services accepts the state plan for filing. The Second Circuit rejected this argument in *Oberlander v. Perales,* 740 F.2d 116 (2d Cir.1984).

■ The court finds plaintiffs' reasoning strained and unpersuasive. In this case, where the only defendants are state defendants and where any reimbursement order for past years (however phrased) will adversely affect the state treasury, the retroactive relief sought by plaintiffs is barred by the Eleventh Amendment. *See Massachusetts Hospital Ass'n, Inc. v. Harris*, 500 F.Supp. 1270, 1279 (D.Mass.1980) (*"Edelman* and its progeny clearly prevent the federal courts from achieving through the artful use of injunctive relief the identical result obtained by a retroactive award of money damages.").

With regard to plaintiffs' claims concerning past rate methodologies that are no longer in effect, declaratory relief is no more appropriate. "The formula to be tested for prospective purposes should be the current, not an outdated, one." *Hospital Ass'n of New York State, Inc. v. Toia*, 577 F.2d 790, 798 (2d Cir.1978) (citations omitted). Furthermore, it would be an improper exercise of discretion for a federal court to grant a declaratory judgment simply as a means of facilitating a plaintiff's claim for money damages in state court. *Toia, supra; New York Health and Hospitals Corp. v. Blum*, 708 F.2d 880, 885 n. 4 (2d Cir.1983) ("to the extent that this action is a stalking horse for a state action in damages, we frown upon resort to the equitable remedy of a declaratory judgment in a federal court").

In view of the foregoing, plaintiffs' claims regarding base year ceilings that have been subsequently revised or abolished must be dismissed—namely, ceilings regarding salaries and fees (fourth and fifth claims, August 1982 complaint)[8] and moveable equipment costs (eighth, ninth, tenth, eleventh, and twelfth claims, February 1983 complaint). Plaintiffs' claims regarding "start-up" costs incurred in 1975 (first, second, and third claims, August 1982 and February 1983 complaints) and reporting costs incurred in 1979 (sixth claim, August 1982 complaint; fourth claim, February 1983 complaint) must also be dismissed, since such claims relate entirely to costs incurred in prior years. Franklin's alleged "start-up" costs reflect losses attributable to the under-utilization that a facility experiences during its initial period of occupancy. Because Franklin cannot incur "start-up" costs again, plaintiffs face no future injury from defendants' challenged policy concerning such costs.

With regard to computer costs incurred in complying with reporting requirements, plaintiffs' challenge is restricted to defendants' decision not to allow reimbursement of costs incurred in 1979 on a current-year basis. Computer costs, to the extent they continue to be incurred, are fully allowable for inclusion in base year costs. Moreover, plaintiffs' claims with regard to such costs arise strictly under state law and thus fail to state a federal cause of action. *See Oberlander v. Perales*, 740 F.2d 116, 119 (2nd Cir.1984).

State law and the state plan are the grounds for three of plaintiffs' five claims with regard to real property costs (sixth, seventh, and thirteenth claims, February 1983 complaint), which also must be dismissed in light of *Oberlander.* Of the two remaining claims, one alleges a federal constitutional claim, the other a federal statutory claim. The constitutional claim (eleventh claim, February 1983 complaint) asserts that defendants' application of a ceiling to Franklin's real property costs violates the equal protection clause since defendants reimburse Article 28–A facilities for such costs without application of a ceil-

---

8. Defendants discount the fact that base year ceilings were increased in subsequent years on the ground that such increases are irrelevant to their claims with regard to earlier years (1979–1981). Plaintiffs here plainly seek retroactive relief, arguing that "[d]efendants' statement that ... adjustments are provided for in the 1982 and 1983 rate methodologies merely seeks to confuse the issues before the court." However, in view of the Eleventh Amendment, claims with regard to earlier years may be maintained only to the extent that the bases of such claims remain effective. *See Hospital Ass'n. v. Toia, supra.*

Furthermore, plaintiffs lack standing to challenge ceilings for salaries of administrators and medical directors since plaintiffs' actual base year costs were concededly below the ceilings.

ing. In *Aishel Avraham, supra,* this court rejected another proprietary facility's equal protection claim based on the state's special treatment of Article 28–A facilities:

> Because this claim does not involve a suspect classification, the state's contrary treatment of RHCFs must be judged under the test of rationality. *See Dandridge v. Williams,* 397 U.S. 471 [90 S.Ct. 1153, 25 L.Ed.2d 491] (1970). According to defendants, P.H.L. Article 28–A was enacted to encourage the development of non-profit RHCFs by providing low-interest government-sponsored mortgages. Such mortgages are financed through the sales of bonds and notes. The reimbursement rates for Article 28–A facilities are therefore somewhat more liberal than those for other RHCFs in order to ensure the marketability of those bonds and notes. The court finds that such governmental purpose is legitimate and that the special treatment of Article 28–A facilities is rationally related to that purpose.

The court adheres to its analysis in *Aishel Avraham.* Accordingly, the equal protection claim must be dismissed.

Plaintiffs' statutory claim alleges that defendants' " *per se* ceilings" applied to real property costs violates federal and state law, pursuant to which "all reasonable costs are to be reimbursed." As plaintiffs' counsel now concedes (*see* June 18, 1985 letter), the "[f]ederal Medicaid statute does not require reimbursement of all actual reasonable costs." Rather, the current law, 42 U.S.C. § 1396a(a)(13)(A), requires that the state plan reimburse Medicaid providers according to rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...."

Section 1396a(a)(13)(A) reflects an intent on the part of Congress to grant the states flexibility and discretion in setting reimbursement rates. *See Nebraska Health Care Ass'n., Inc., v. Dunning,* 575 F.Supp. 176 (D.Neb.1983). The state need not reimburse each provider for all costs incurred and may instead set class-wide rates based on a consideration of the costs of the class of providers.[9] *Ohio State Pharmaceutical Ass'n v. Creasy,* 587 F.Supp. 698, 709–10 (S.D.Ohio 1984). However, the state's discretion in setting such rates is not absolute: the rates must be reasonable. *Id.*

The parties have not presented much evidence on the question of reasonableness, relying instead on broad theories of liability and immunity. Plaintiffs apparently assume that *"per se* ceilings" constitute a *per se* violation of federal law; defendants contend that their discretion under the law is virtually unreviewable.[10] The court does not find support for either position in the language of the statute or in case law.

Because the present record does not afford a sufficient basis for a determination

---

**9.** For this reason, the real property rate at issue, viewed on a class-wide basis, may be reasonable even though it does not fully reimburse Franklin for costs incurred pursuant to a concededly "arm's-length" lease.

**10.** Defendants also argue that plaintiffs' statutory claims do not arise under federal law, since such claims "are really addressed to alleged violations of state law." While it is true that current state law, P.H.L. § 2807(3), requires "reasonable and adequate" reimbursement, *see* footnote 2, and therefore a violation of the federal statute also violates state law, this fact does not mean that every challenge to a state Medicaid practice is "really addressed" to P.H.L. § 2807(3) and may be brought only in state court. *Oberlander, supra,* is not to the contrary. There the Medicaid providers' claims derived entirely from state regulations, and the Second Circuit rejected the "tortuous argument" that would have provided "a jurisdictional basis for federal judicial review of every disputed state administrative ruling relating to Medicaid." 740 F.2d at 119. The court distinguished the case before it from those cases involving "allegations of a specific conflict of state plan *or practice* on the one hand and a federal mandate on the other." *Id.* (emphasis added). In a case cited in *Oberlander, Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056 (D.Mass.1975), the court exercised federal question jurisdiction over claims that a state pattern and practice violated the then-current federal standard of reimbursement. Like the plaintiffs in *Sargent,* the plaintiffs here do not complain of an isolated administrative decision applicable only to their facility; rather, defendants' rate ceiling constitutes the kind of state practice that may be challenged on federal grounds.

as to the reasonableness of the rate ceiling at issue, summary judgment is inappropriate.

### Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is denied in all respects. Defendants' motion for summary judgment is denied as to the issue of the reasonableness of the real property rate, but granted as to all other claims. Plaintiffs' complaints are dismissed except to the extent that the February 1983 complaint alleges that defendants' real property rate ceiling violates the federal Medicaid statute.

So Ordered.