**CALMAQUIP ENGINEERING WEST HEMISPHERE CORPORATION, Plaintiff-Appellee,**

**v.**

**WEST COAST CARRIERS LTD., Farovi Shipping Corp., and the M/V "Fortune Carrier", her engineer, tackle, Etc., Defendants,**

**West Coast Carriers, Ltd., Defendant-Appellant.**

Nos. 79-2926, 79-3248.

United States Court of Appeals, Fifth Circuit. Unit B

July 13, 1981.

Richard F. Ralph, Miami, Fla., for defendant-appellant.

Smathers & Thompson, Rodney Earl Walton, Miami, Fla., for plaintiff-appellee.

Before KRAVITCH and THOMAS A. CLARK, Circuit Judges, and LYNNE *, District Judge.

THOMAS A. CLARK, Circuit Judge:

This is a consolidated appeal from the grant of summary judgment in favor of

---

* District Judge of the Northern District of Alabama, sitting by designation.

plaintiff below, Calmaquip Engineering West Hemisphere Corp. (the "shipper"), in an admiralty action for cargo damage brought under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 *et seq.* Appellant, West Coast Carriers Ltd. (the "carrier"), objects to the $40,917.07 awarded to Calmaquip for cargo damage sustained during carriage from the port of Miami to the Panamanian port of Las Minas and the inland destination of Tocumen. We affirm.

In January, 1977, West Coast Carriers agreed to transport seven airport loading bridges, disassembled into fifty parts, pursuant to a bill of lading that directed delivery to a new international airport at Tocumen, Panama.[1] Calmaquip delivered the cargo to the carrier's stevedore at Dodge Island, Florida, between February 8 and February 15, 1977, specifically directing the carrier's agent to ship the cargo below deck. The bill of lading also specified below deck storage.

The bridges had been prepared for shipment by the manufacturer, Wollard Aircraft, and sprayed with an oil base coating designed to protect against salt air and salt water damage. The open sections of the bridges were capped with plywood and caulked, and lifting eyes had been attached to the plywood caps in order to facilitate unloading. The airport loading tunnels had been cut into forty-foot modules in order to fit inside the ship's hold. The carrier received the cargo without exception and issued dock receipts for fifty pieces of cargo.

During carriage the carrier stored the bridges both above and below deck, and when the cargo was discharged at Las Minas on February 21, 1977, exceptions were noted by a person not identified by the parties, indicating that the cargo had been damaged.[2] On March 24, 1977, the cargo arrived at its inland destination of Tocumen. In addition to the carriage charges between Florida and Las Minas, the shipper paid West Coast Carriers $10,000 for the inland carriage. At Tocumen, engineer Antonio Oyarzun, project manager for the installation of the bridges, examined the cargo and determined that forty-three of the fifty pieces were damaged. He calculated that their repair would cost $40,917.07.

## I.

Before turning to the merits of this appeal, it must be noted that this court technically has two consolidated cases before it on appeal. However, the two appeals are both taken from the same single district court case. Below, the district court granted summary judgment for the plaintiff-shipper on July 6, 1979. Summary judgment was entered in an order labeled "Order Granting Motion for Summary Judgment." For reasons that are not entirely clear from the record, the district court did not enter a separate judgment as required by Rule 58 of the Federal Rules of Civil Procedure until August 27, 1979.[3] However, before the final judgment was entered, the appellant, on August 3, 1979, noticed an appeal from the July 6 order that had granted summary judgment for the plaintiff-appellee. That "appeal" was docketed in this court as appeal No. 79–2926.

After the district court complied with Rule 58, the appellant, on September 14, 1979, filed a second notice of appeal which was docketed in this court as appeal No. 79–3248. The appellee, Calmaquip Engineering, has moved to dismiss the appellant's first appeal in this case, No. 79–2926. We agree that the first appeal must be dismissed.

This court has held previously that a ruling which grants a motion for summary judgment by itself is not an appealable order. *Nunez v. Superior Oil Co.*, 535 F.2d 324 (5th Cir. 1976). There must also be strict mechanical compliance with the re-

---

1. Bill of Lading, R., Vol. II, at 221:

| D.A.C. Tocumen Airport Panama | Evidencing shipment of: Suministro e instalacion de equipos para el terminal del nuevo aeropuerto internacional de Tocumen, segun contrato # 47/75 C. I. F. Panama. |

2. Plaintiff's Exhibit # 16B, R., Vol. II, at 273–4.

3. The district court's "Final Summary Judgment" was dated August 20, 1979.

quirement of Rule 58 that the judgment be set forth on a separate document. *United States v. Indrelunas*, 411 U.S. 216, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973); *Taylor v. Sterrett*, 527 F.2d 856 (5th Cir. 1976); *State National Bank of El Paso v. United States*, 488 F.2d 890 (5th Cir. 1974). Here, at the time of the appellant's first notice of appeal, the district court had not yet entered its "Final Summary Judgment," the separate document required under Rule 58. Therefore, the appellant's appeal No. 79–2926 was premature and is hereby dismissed.

■ The premature first appeal did not, as the appellant suggests, divest the district court of its jurisdiction to enter the final judgment. As this court has held, "[t]he requirements of Rule 58 may be satisfied by the district court after an appeal is docketed." *Kirtland v. J. Ray McDermott & Co.*, 568 F.2d 1166, 1169 (5th Cir. 1980).

We emphasize, however, that by dismissing the appeal in No. 79–2926 the appellant suffers no prejudice as both appeals were taken from the same summary judgment order. Apparently, once the appellant realized that its first notice of appeal might be premature, it wisely chose to perfect another appeal after the entry of final judgment, heeding this court's advice in *Markham v. Holt*, 369 F.2d 940, 943 (5th Cir. 1966). The notice of the second appeal was filed within the appropriate time period after the final judgment was entered. We now turn to a consideration of the merits of that appeal.

## II.

On appeal from the award of summary judgment in favor of the shipper, our inquiry must focus on whether the trial court erred in concluding that there were no contested issues of material fact. We find no error. Pursuant to local rule, plaintiff below filed a statement of material facts in support of its motion for summary judgment. Local Rule 10(J)(2) states:

Motions for summary judgment shall be accompanied by a memorandum of law, necessary affidavits, stamped addressed envelopes for notice, and a concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment *shall include* a memorandum of law, necessary affidavits, and *a concise statement of the material facts* as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed *admitted unless controverted* by the opposing party's statement [emphasis added].

The plaintiff submitted a list consisting of ten material facts. The carrier contested only fact number four regarding the clarity of directions specifying below deck storage. Furthermore, the defendant submitted no alternative statement of facts.

The failure to contest Calmaquip's statement of facts prohibits appellant from contesting these facts for the first time on appeal. According to local rule 10(J)(2), any facts set forth on a motion for summary judgment are deemed admitted unless controverted by the opposing party's own statement of facts. The requirements of rule 10(J)(2) are mandatory and may not be waived. In *United States v. Warren*, 601 F.2d 471 (9th Cir. 1979), the Court of Appeals for the Ninth Circuit upheld a local rule providing that a failure to file a brief in opposition to a motion constituted a consent of the party failing to file. In so holding the court concluded that "[i]t is undisputed that district courts have the authority to 'prescribe rules for the conduct of their business' in any manner not inconsistent with the federal rules or Acts of Congress." 601 F.2d at 473 (citations omitted).[4]

---

4. *See also Woods Construction Co. v. Atlas Chemical Industries, Inc.*, 337 F.2d 888, 891 (10th Cir. 1964), in which the court upheld a local rule governing the timely filing of a verified bill of costs, reasoning that "[i]t is appar-

In the instant case, because the carrier failed to contest the shipper's facts, we give no consideration to the carrier's contention that the deposition of Antonio Oyarzun lacks credibility. The sole basis for this contention is that Oyarzun stated that forty-three of the fifty pieces of cargo were damaged, whereas the carrier claims that only forth-nine pieces of cargo were shipped. West Coast's uncontested fact number six states that "dock receipts for 50 packages were issued"; consequently, that fact is deemed to have been admitted.

■ Neither can we seriously consider the defenses which the carrier raises involving "insufficiency of packaging" and "latent defects" in the cargo. See 46 U.S.C. § 1304(2)(n). The facts in the shipper's rule 10(J)(2) statement directly contradict these defenses, and furthermore the carrier failed to raise these defenses in its pleadings, its pre-trial order, or its memorandum in response to the shipper's motion for summary judgment. We will not take note of error raised for the first time on appeal except where the interest of substantial justice is at stake. This is not such a case.[5]

■ Appellant also argues that the trial court erred in refusing to grant the shipper's motion to amend its complaint to name the shipper's insurance carrier as the proper plaintiff. This argument is frivolous. Not only did the carrier fail to raise this contention at trial, but the carrier failed even to respond to the motion at the time it was made. In any event, a party has no standing to complain of the trial court's failure to grant a motion filed by an opposing party. Accordingly, we give this argument no consideration.

Having noted those contentions raised for the first time on appeal, we turn to the remaining issues that are properly before this court. The carrier, in its response to the shipper's motion for summary judgment, contested fact number four regarding the specificity of the shipper's directions for below deck storage. We have reviewed the record which was before the trial court when it ruled in favor of the shipper's motion, and we agree that the trial court properly concluded that the carrier had failed to sustain its burden of showing a contested issue of fact regarding directions for below deck storage. During the deposition of Vincent R. Rodriguez, appellant's own witness, the following question was asked regarding a letter sent by Calmaquip which specified the manner of carriage:

Q: [By plaintiff's counsel] What was the purpose of that letter?

A: [Rodriguez] Right. It is advising us that the merchandise should go on board and under deck, not the Bill of Lading, but the merchandise.[6]

Appellant introduced no additional evidence regarding directions for below-deck storage, and we therefore conclude that the trial court did not err in holding that appellant raised no contested issue of material fact regarding directions for below deck storage. With the exception of appellant's pleadings, the issue was not disputed, and it is well settled that, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, . . . ." Fed.R.Civ. Pro. 56(e).

The remaining issues which are properly before this court revolve around the applicability of the Carriage of Goods by Sea Act (the "COGSA"), 46 U.S.C. § 1300 et seq. The carrier's argument is based upon §§ 1304(4) and (5) which state:

*Deviations*

(4) Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any

---

ent that there must be such a definite limit. . . . A litigant has a right to rely upon the local rules, as the parties and the court are bound by them."

**5.** *See Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

**6.** R., Vol. II, at 173.

loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

*Amount of liability; valuation of cargo*
(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

Neither the carrier nor the shipper shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of lading.

■ Carrier's statutory argument has three aspects, the first involving the threshold question of COGSA's applicability. Under COGSA, whenever a carrier materially deviates from the terms of the contract of carriage, the legal relations between the carrier and shipper are altered dramatically. "[T]he clear plan of COGSA is to differentiate between reasonable deviations, which are without legal consequences, and unreasonable deviations, which entail serious ones." [7] The primary consequence which follows upon material deviation is that the carrier no longer benefits from any terms in the contract of carriage which are favorable to the carrier. Instead the carrier becomes, in relation to the shipper, an insurer of the shipper's goods.

Thus our initial inquiry is whether the on deck storage constituted a material deviation from the contract of carriage. If the deviation was material, the carrier will be liable as an insurer for the full amount of the damage; if the deviation was not material, the carrier's liability will be limited to $500 "per package" as prescribed by § 1304(5).

In considering the issue, we are guided by a factually analogous Fifth Circuit case, *Spartus Corp. v. S/S Yafo,* 590 F.2d 1310 (5th Cir. 1979). That case affirmed the entry of judgment in favor of the shipper and against the carrier in the amount of $83,939.36 for damages sustained to a shipment of clock movements between Ashed, Israel, and Louisville, Mississippi. About ten days out of Miami, Florida, the Israeli government had instructed the vessel's captain to unload the cargo at Mobile, Alabama, in order to take on military supplies and return to Israel in aid of that nation's military efforts. The *Yafo* thus unloaded the clock movements on an unsheltered Mobile dock where, due to several inches of rainfall, the containers and their contents suffered serious water damage. The court held that the offloading of the cargo at Mobile constituted a material deviation. " 'Such conduct [is] a departure from the course of agreed transit and ... constitute[s] a "deviation" whereby the goods have been subjected to greater risks ....' " 590 F.2d at 1313, *quoting G. W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.G.,* 28 F.2d 249, 251 (3d Cir. 1928).

Even more controlling is our holding in *Searoad Shipping Co. v. E. I. duPont de Nemours and Company,* 361 F.2d 833 (5th Cir. 1966), to the effect that if the parties had *no express agreement* regarding below deck storage, "a clean bill of lading imports under deck stowage." *Id.* at 835, quoting

---

7. *Hellenic Lines, Ltd. v. United States,* 512 F.2d 1196, 1206 (2d Cir. 1975).

*St. Johns N.F. Shipping Corp. v. S. A. Companhia Geral Commercial Do Rio de Janerio,* 263 U.S. 119, 124, 44 S.Ct. 30, 31, 68 L.Ed. 201 (1923). In *Searoad* the shipper had contracted for the carriage of explosives pursuant to a clean bill of lading. During the voyage from Key Largo in the Florida Keys to Freeport, Grand Bahama Island, the explosives were totally destroyed by heavy weather. The district court granted judgment in favor of the shipper "on the basis that deckloading the cargo covered by a clean, under-deck bill of lading amounted to a deviation making the vessel an insurer" and the Fifth Circuit Court of Appeals affirmed. *Id.* at 834.

These two cases are supported by numerous decisions from other circuits holding that on deck storage constitutes a material deviation, giving rise to insurer's liability. In *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer,* 422 F.2d 7 (2d Cir. 1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), for example, the Second Circuit held that even where the bill of lading did not specify below deck storage, "[i]f there is no definite agreement one way or the other, the shipper is entitled to expect below deck stowage." *Id.* at 14 (footnote omitted). In so holding, the court emphasized that a primary purpose of COGSA was to protect shippers' reasonable expectations from hidden clauses in the carriers' standardized forms:

> It is impractical for a shipper to be compelled to make a detailed study of all the fine print clauses of the carrier's regular bill on each occasion before it ships out a package. One of the principal purposes of COGSA was to obviate the necessity for doing so.

*Id.*

◼ In the instant case, the carrier's on deck storage, in contravention to an express direction of below deck storage, constituted a material deviation from the terms of the carriage contract, giving rise to insurer liability for the damaged cargo. The terms of the bill of lading were clear; the carrier simply failed to perform them.

◼ In so holding, we need not consider appellant's second contention premised upon COGSA, that the fifty pieces of cargo transported by the carrier constituted one package for purposes of calculating damages under § 1304(5), thereby limiting carrier's liability to $500. We note in passing, however, that were we to consider the question, our reading of *Stirnimann v. The San Diego,* 148 F.2d 141 (2d Cir. 1945), would persuade us that the mere fact that the 50 pieces of bridging were not "fully enclosed" would not preclude a finding of 50 "packages." In *Stirnimann,* a giant amusement park crane had been shipped in 126 component parts. The Second Circuit affirmed the trial court's holding that each of the 126 pieces was a separate "package," for purposes of computing damages under § 1304(5).

Appellant's third argument for the limitation of liability under COGSA is based upon the fact that carriage occurred in two segments—from Miami to the Panamanian port of Las Minas, and from Las Minas to the inland airport at Tocumen. Because the shipper's damage calculations were ascertained as a result of information gathered primarily at Tocumen, the carrier argues that it should not be held liable for damages which occurred during shipment between Las Minas and Tocumen.

◼ The carrier argues that it was not liable for the inland carriage because it acted only as a forwarding agent on behalf of the shipper in arranging inland transportation. Carrier's argument is based upon clause four of a booking note which states that the carrier shall not be liable for loss or damage incurred after discharge from the vessel. We are not persuaded by this argument. The Carrier was paid an additional $10,000 in order to complete inland carriage to Tocumen. The booking note to which appellant refers was unsigned by either party and therefore was not part of the contract of carriage. Finally, COGSA was enacted in order to eliminate the possibility that a carrier could shield itself from liability through manipulation of fine print clauses contained in standardized contract forms.

*See e. g., Encyclopaedia Britannica, supra,* 422 F.2d at 14.

■ Carrier next argues that the shipper failed to sustain its burden of proving that the deviation proximately caused the damage, and that thus the carrier incurred no liability. Appellant's argument is based upon its understanding of *Searoad Shipping Co. v. E. I. duPont de Nemours and Company, Inc.,* 361 F.2d 833 (5th Cir. 1966), which the Carrier contends stands for the proposition that damage must be causally related to the deviation in order to give rise to carrier liability. This contention does not, however, accurately reflect that case. As mentioned above, *Searoad* involved the on deck storage of explosives that were damaged as a result of poor weather conditions. Neither party contested the fact that the on deck storage proximately caused the damage, and consequently that issue was not before the court. The sole issue the court considered involved deviation. Thus, on appeal we held that "insurer liability continues after COGSA to flow from ondeck deviation where the damage is causally related." *Id.* at 835–36 (footnotes omitted).

We need not conclude our analysis by distinguishing *Searoad.* Two other circuit court of appeals cases reject arguments identical to appellant's. The first is *Swedish American Line v. Evans Products Co.,* 431 F.2d 869 (4th Cir. 1970), and the second is *Blasser Brothers v. Northern Pan-American Line,* 628 F.2d 376 (5th Cir. 1980), a recent case explicitly adopting the rationale of *Swedish American.* In *Swedish American,* cargo had been transported by the defendant's ship from Sweden to Norfolk, Virginia, and then by rail to Illinois. The carrier issued a bill of lading from Sweden to Norfolk, and the inland rail transportation was pursuant to a separate bill of lading. The carrier argued that its damage liability should be limited to those damages which occurred between Sweden and Norfolk. The court rejected the carrier's argument:

Since the defects observed in Illinois were similar to the damage noted when the cargo was discharged in Norfolk, the trial court could draw the inference that the damage ascertained in Illinois was caused by the ship. [So too, in the case under consideration, damage was observed in Las Minas identical to that observed at Tocumen.] This is a finding of fact which we cannot say is clearly erroneous. Fed.R.Civ.P. 52(a). Evans [plaintiff] did not have to prove a negative—that none of the damage occurred during transportation by rail—for under the Carriage of Goods by Sea Act §§ 3–4, [46 U.S.C. §§ 1303–04 (1964)], when Evans proved good delivery of all the hardboard in Sweden and bad outturn of a portion in Norfolk, the ship then had to prove what part of the balance of the cargo was unloaded in good condition.

*Swedish American,* 431 F.2d at 870 (citations omitted).

Similarly, in *Blasser Brothers, Inc. v. Northern Pan-American Line,* 628 F.2d 376 (5th Cir. 1980), the Fifth Circuit upheld a damage award on behalf of the shipper despite the carrier's contention that the shipper had failed to sustain its burden of proving that the carriage proximately caused the damage. Citing *Swedish American, supra,* with approval, the court concluded that, once the shipper had established its delivery of cargo to the carrier in good condition, "the carrier then ha[d] the burden of proving that it exercised due diligence to prevent the damage." *Id.* at 381. Even more significant to our present consideration, the court held that:

[O]nce the shipper has presented its prima facie case, the carrier, if unable to rebut the shipper's position, will be liable for the entire damaged cargo unless it can prove what portion was not actually damaged . . . .

*Id.* at 382.

Because the carrier does not contest receipt of the airport loading bridges in good condition, shipper has established a prima facie case. Assuming, *arguendo,* the the carrier's liability ceased upon receipt of goods at Las Minas, it was encumbent upon the carrier to rebut the shipper's prima facie showing by introducing evidence that

the cargo was damaged *after* the cessation of the carrier's liability. No such evidence was introduced, and we therefore conclude that the trial court did not err in awarding summary judgment in favor of the shipper.

In summary, the appeal in No. 79–2926 is DISMISSED. The judgment in No. 79–3248 is AFFIRMED.